**RECORD NO. 13-4332(L)**
**CONSOLIDATED W/13-4333**

# IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

IVAN ALTAMIRANO PEREZ;
ROBERTO MORALES PEREZ,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HONORABLE WILLIAM D. QUARLES, JR., U.S.D.J.

**CONSOLIDATED BRIEF OF APPELLANTS**

Thomas J. Saunders
LAW OFFICE OF
  THOMAS J. SAUNDERS
3600 Clipper Mill Road
Suite 201
Baltimore, Maryland 21211
(410) 662-5586
thomas.j.saunders@gmail.com

*Counsel for Appellant*
*Roberto Morales Perez*

Richard B. Bardos
SCHULMAN, TREEM,
KAMINKOW & GILDEN, PA
18 Floor The World Trade Center
401 East Pratt Street
Baltimore, Maryland 21202
(410) 332-0850
rbardos@schulmantreem.com

*Counsel for Appellant*
*Ivan Altamirano Perez*

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER JURISDICTION
    AND BASIS FOR APPELLATE JURISDICTION . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    I.    Whether the District Court Erred in Crediting Unreliable Hearsay
          Which Was the Sole Evidentiary Basis for a Finding the Appellant
          Held a Managerial Role in the Underlying Conspiracy? . . . . . . . . . 2
    II.   Whether the Trial Court Erred in Sentencing Roberto Morales . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF THE ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    I.    The District Court Erred in Crediting Unreliable Hearsay Which Was
          the Sole Evidentiary Basis for a Finding the Appellant Held a
          Managerial Role in the Underlying Conspiracy . . . . . . . . . . . . . . . 12
          A.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
          B.   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    II.   The Trial Court Erred in Sentencing Roberto Morales . . . . . . . . . 24
          A.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          B.   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH
    LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

i

TABLE OF AUTHORITIES

Federal Cases

*United States v. Cameron*, 573 F.3d 179 (4th Cir 2009) . . . . . . . . . . . . . . . . . 12, 18

*United States v. Contreras,* 593 F3d 1135 (9th Cir. ) . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Harrison,* 272 F.3d 220 (4th Cir. 2001) . . . . . . . . . . . . . . . . . 25

*United States v. Medina-Campo*, 714 F.3d 232 (4th Cir. 2013) . . . . . . . . . . . . . 24

*United States v. Perez*, 90 Fed. Appx. 168 (7th Cir. 2004) . . . . . . . . . . . . . . . . 26

*United States v. Powell*, 650 F.3d 388 (4th Cir. 2011) . . . . . . . . . . . . . . . . . 23, 25

*United States v. Sayles*, 296 F.3d 219 (4th Cir. 2002) . . . . . . . . . . . . . . . . . 12, 18

*United States v. Vargas*, 73 Fed. Appx. 746 (5th Cir. 2003) . . . . . . . . . . . . . . 26

*United States v. Velez,* 185 F.3d 1048 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . 26

Other Authorities

18 USC§1028 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

18 USC § 1546 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

18 USC § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 USC § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42  USC § 408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Sec. 2B1.1(a), Federal Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Sec. 2L2.l, Federal Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25

Sec. 3B1.1(a), Federal Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . 13, 14, 18

iii

## STATEMENT OF SUBJECT MATTER JURISDICTION
## AND BASIS FOR APPELLATE JURISDICTION

Ivan Perez and Roberto Perez appeal from the final judgments of conviction and sentence from the United States District Court for the District of Maryland at Baltimore. The United States District Court for the District of Maryland was the Court of original subject matter jurisdiction pursuant to Title 18 U.S.C. § 3231. On May 15, 2012 Roberto Perez pled guilty to Counts 1,10 and 11 pursuant to a plea agreement. On May 23, 2012, Ivan Perez pled guilty to the indictment without a plea agreement. The Court entered guilty findings to Counts 1 and 3-8, and not guilty on Count 2.

On April 23, 2013 Ivan Perez was sentenced to 97 months on Counts 1,3,6,5 and 8, and 60 months on Counts 4 and 7 all to run concurrent with 3 years of supervised release. On April 30, 2013 Ivan Perez filed a timely notice of appeal.

On April 24, 2013 Roberto Perez was sentenced to 72 months on Count 1, 60 months on Count 10 and 72 months on Count 11 all to tun concurrent, with 3 years of supervised release. On April 26, 2013 Roberto Perez filed a timely notice of appeal.

The United States Court of Appeals for the Fourth Circuit has jurisdiction of the appeal pursuant to 28 U.S.C. § 1291.

STATEMENT OF THE ISSUES

I.   Whether the District Court Erred in Crediting Unreliable Hearsay Which Was the Sole Evidentiary Basis for a Finding the Appellant Held a Managerial Role in the Underlying Conspiracy?

II.  Whether the Trial Court Erred in Sentencing Roberto Morales

STATEMENT OF THE CASE

Ivan Perez and Roberto Perez were charged in an 11 Count indictment. Count 1 charged them with a conspiracy to manufacture fake, false and fraudulent identification documents which appeared to be issued by or under the authority of the United States and to transfer such documents in violation of 18 U.S.C. §§ 1028(a)(l), (a)(2) and (c)(l) and §§ 1028(f) and (c)(l). Count 2 charged them with producing false identification documents in violation of 18 U.S.C. §§ 1028(a)(l) and (c)(l). Count 3 charged Ivan Perez for acts on with transferring false documents on January 5, 2011 in violation of 18 U.S.C. §1028(a)(2) and (c)(l); Count 4 charged him with counterfeiting a card that purports to be a social security card issued by the Commissioner of Social Security in violation of 42 U.S.C. § 408(a)(7)(C); and Count 5 charged him with counterfeiting a Permanent Resident Card in violation of 18 U.S.C. § 1546; Count 6 charged Ivan Perez with transferreing false identification documents, including two false Permanent Resident Cards and two false Social

Security Number Cards on February 14, 2011 in violation of 18 U.S.C. § 1028(a)(2) and (c)(1); Count 7 charged Ivan Perez with counterfeiting a social security card in violation of 42 U.S.C. § 408(a)(7)(C); Count 8 charged Ivan Perez with counterfeiting two false Permanent Resident Cards in violation of 18 U.S.C. § 1546; Count 9 charged Roberto Perez with transferring including three false Permanent Resident Cards and three false Social Security Number Cards on April 30, 2010 in violation of 18 U.S.C. §1028(a)(2) and (c)(l); Count 10 charged Roberto Perez with counterfeiting a social security card in violation of 42 U.S.C. § 408(a)(7)(C); and Count 11 charged Roberto Perez with counterfeiting three false Permanent Resident Cards in violation of 18 U.S.C. § 1546; Count 12 charged Roberto Perez with transferring two false Permanent Resident Cards and two false Social Security Number Cards on August 27, 2010 in violation of 18 U.S.C. §1028(a)(2) and (c)(l); Count 13 charged Roberto Perez with counterfeiting and transferring Social Security Number Cards in violation of 42 U.S.C. § 408(a)(7)(C); and Count 14 charged Roberto Perez with counterfeiting two false Permanent Resident Cards which he transferred to an individual in violation of 18 U.S.C. § 1546.

On May 23, 2012, Ivan Perez pled guilty to the indictment without a plea agreement. The Court entered guilty findings to Counts 1 and 3-8, and not guilty on Count 2.

3

On April 23, 2013 Ivan Perez was sentenced to 97 months on Counts 1,3,6,5 and 8, and 60 months on Counts 4 and 7 all to run concurrent with 3 years of supervised release. On April 30, 2013 Ivan Perez filed a timely notice of appeal.

On April 24, 2013 Roberto Perez was sentenced to 72 months on Count 1, 60 months on Count 10 and 72 months on Count 11 all to tun concurrent, with 3 years of supervised release. On April 26, 2013 Roberto Perez filed a timely notice of appeal.

## STATEMENT OF FACTS

Ivan Perez pled guilty and accepted the following facts in his plea:[1]

1.  Defendant Ivan Altamirano-Perez (hereinafter "the Defendant") is a citizen of the Mexico and is present in the United States without authorization.

2.  From in or around June 2008 through in or around July, 2011, the Defendant was involved with one or more other individuals in the distribution of fake, false and fraudulent identification documents to individuals illegally present in the United States. The fake, false and fraudulent identification documents manufactured and distributed by the Defendant and his coconspirators were designed to look like legitimate United States immigration identity documents (Legal Permanent Resident Cards and Employment Authorization cards) and United States social security number cards.

3.  These documents were offered for sale and distributed in and around the 200 block of South Broadway in Baltimore, Maryland (the "Broadway Territory"), and manufactured in or in close proximity to the Broadway Territory.

4.  Responsibility for manufacturing the identity documents - and the right

---

[1]Paper 140, WDQ 11-414

4

to collect income for manufacturing the identity document - rotated among various individuals (the Broadway Mill Operators"). The location of the manufacturing operation (the "Mill") was changed frequently to avoid detection.

5. The Defendant and his co-conspirators sold documents themselves or assisted by collecting orders from salesmen and delivering documents back to the salesmen once they had been manufactured. During the time the conspiracy was in operation, ten or more individuals sold and distributed the identity documents manufactured by the Broadway Mill Operators.

6. For example, on or about January 5, 2010, in the District of Maryland, the Defendant transferred false identification documents, including a false United States social security account number card and a false Lawful Permanent Resident card, to an individual in exchange for payment of money. Also, on February 14, 2010, in the District of Maryland, the Defendant and co-defendant Daniel Cruz-Martinez, working together, transferred false identification documents, including a false United States social security number card and a false Lawful Permanent Resident card, to an individual in exchange for payment of money.

7. During the course of his conduct, the Defendant and his co-conspirators distributed over 100 sets of identification documents, including Legal Permanent Resident cards, Employment Authorization cards, and social security number cards. The LPR and Employment Authorization cards are both types of documents used for entry into the United States and as evidence that the holder is authorized to stay and/or work in the United States.

Roberto Perez pled guilty and accepted the following facts in his plea:[2]

1. Defendant Roberto Morales-Perez (hereinafter "the Defendant") is a citizen of Mexico and is present in the United States without authorization.

2. From in or around June 2008 through in or around July, 2011, the

---

[2]Paper 122, WDQ 11-414

Defendant was involved with one or more other individuals in the distribution of fake, false and fraudulent identification documents to individuals illegally present in the United States. The fake, false and fraudulent identification documents manufactured and distributed by the Defendant and his coconspirators were designed to look like legitimate United States immigration identity documents (Legal Permanent Resident Cards and Employment Authorization cards) and United States social security number cards.

3.    These documents were offered for sale and distributed in and around the 200 block of South Broadway in Baltimore, Maryland (the "Broadway Territory"), and manufactured in or in close proximity to the Broadway Territory.

4.    Responsibility for manufacturing the identity documents - and the right to collect income for manufacturing the identity document - rotated among various individuals. From June, 2008 through May, 2010, Defendant and his brother, Ivan Altamirano-Perez, shared the territory and took turns manufacturing the identity documents. Beginning in or around May, 2010, and continuing until the arrests of the defendants in this case, the Defendant shared the territory and manufacturing rights with Ivan Altamiraon-Perczand Miquel Reyes-Ontiveros (collectively, the "Broadway Mill Operators"). The location of the manufacturing operation (the "Mill") was changed frequently to avoid detection.

5.    When the Defendant and his fellow Broadway Mill Operators were not engaged in manufacturing the documents, they sold documents themselves or assisted by collecting orders from salesmen and delivering documents back to the salesmen once they had been manufactured. The Broadway Mill Operators used a group of ten or more individuals who sold and distributed the identity documents manufactured by the Broadway Mill operators.

6.    For example, on or about April 30, 2010, in the District of Maryland, the Defendant transferred false identification documents, including a false United States social security account number card and a false Lawful Permanent Resident card, to an individual in exchange for payment of money.

7.    During the course of his conduct, the Defendant and his co-conspirators distributed thousands of sets of identification documents, including Legal Permanent Resident cards, Employment Authorization cards, and

6

social security number cards. The LPR and Employment Authorization cards are both types of documents used for entry into the United States and as evidence that the holder is authorized to stay and/or work in the United States.

After the pleas the trial court had an evidentiary hearing on November 7, 2012. The Government called Special Agent Daniel Benigno Lopez. He testified that both Ivan Perez and Roberto Perez were previously deported and reentered the country. JA 74. In 2008 he learned that there was an organization in the 200 block of South Broadway with runners and "mills in secret places." JA 75. In addition to surveillance confidential informants provided information about documents being sold in the area. JA 76. One confidential source who was in the area daily identified "Elmer" as the individual in charge of the organization. JA 81. "Elmer" is an alias of Ivan Perez. The source also identified Roberto Perez known as "Piza "as responsible for manufacturing documents. A third person known as Miguel Ontiveros was identified as a third individual in charge. JA 82. Another confidential source who was not a part of the organization but in the document manufacturing business identified Ivan Perez as the leader and Roberto Perez as second in command. JA 85.

In reviewing photographs with the prosecutor he identified Roberto Perez and one of them in what he believed to be a document exchange with a runner for the organization. JA 88. In another photograph identified Ivan Perez talking with two

individuals involved in document trafficking. JA 89. In addition to document exchanges observed by him and other agents a confidential source provided the agent with a business card that came from Roberto Perez which contained a number recovered from different phones in the investigation. JA 91-92. In another photograph he identified a group of individuals on Broadway using a "universal sign" for indicating documents were for sale. JA 94.

On another occasion a confidential informant placed a recorded call to Roberto Morales to order documents. Roberto Morales delivered the documents to the informant. JA 99-101. The purchase price for a "set" of documents was about $160-180.00. JA 105. The agent went on to describe other buys from individuals in the organization. Search warrants were executed for Ivan Perez's residence, Roberto Morales' residence and another address on South Parrish Street. JA 127.

The search of South Parrish Street resulted in the seizure of documents that look like Social Security cards, card stock for the printing of those cards, laminating pouches, printer ribbons for a Fargo printer, plastic stock used for the Fargo printer and a photograph and personal information for the production of a set of documents, JA 133-137. A computer was seized and a forensic report from that computer showed images of permanent resident cards and a Pennsylvania drivers license. JA 138. The ribbons used for the Fargo printer have 250 images so that you can only print 125

8

double-sided cards per ribbon. JA 139.

Investigators were able to locate the distributor of the two Fargo printers that were recovered at South Parrish Street. The agent spoke with a person who made the purchases for the organization. That person told the agent that all the purchases for the Fargo printers were made on behalf of Ivan Perez. The records from the distributor identified "about ninety-nine" ribbons directed to the organization. Additionally 13,500 pieces of white plastic card stock were also purchased during the time period covered by the indictment. JA 142-144.

Referring to a separate but related prosecution, the agent found that Mr. Escamilla had been able to produce 800 good IDs out of 1200 attempts. JA 147.

The agent stated that the "manufacturers" of the documents would retain roughly 50% of the purchase price. Each of the three principles in the organization would be in charge one week at a time. A codefendant reported to the agent that Roberto Perez boasted that he made $280,000 in the last two years doing this. JA 148.

South Parrish Street was occupied by an individual identified as "Tenant." He told the agent that Ivan Perez rented the location telling the Tenant that he and his brother had a business in the city and need to be close to the city. JA 152.

Another unidentified informant identified Ivan Perez as "the boss of the organization." He identified Ivan Perez, Roberto Perez and a third defendant has

9

manufacturing the documents. JA 154.

Special Agent Lyndon George was called by the Government. He was familiar with the operation of a Fargo printer. He testified that he uses for colors in the layering process to make many different colors. In order to make one multicolor image on each side of card requires one print which consists of up to four passes he testified that you could make a total of 125 "complete" cards (two-sided) per ribbon. JA 200-201. He dismantled one of the ribbons and found that approximately 20% of the Prince were not usable. JA 202.

## SUMMARY OF THE ARGUMENTS

I.     At the evidentiary hearing on this issue, the Government presented only one witness relevant to Mr. Perez' role:  Special Agent Daniel Lopez.  Although the agent had first-hand knowledge that Appellant was a participant in the conspiracy because, at a minimum, Agent Lopez witnessed Appellant selling false immigration documents, the full remainder of Mr. Lopez' testimony with regard to Appellant's role consisted entirely of what others told him.  None of these other persons were present for the hearing and Agent Lopez was unable to provide any information regarding whether these out-of-court statements were based on the declarants' first-hand knowledge.

A trial court is plainly permitted to rely on hearsay statements at a sentencing

10

hearing. That hearsay must, however, be reliable and trustworthy. Because the Government relied solely on hearsay statements from unnamed witnesses to establish its claim that Appellant was a leader of this conspiracy, the need for reliability was enhanced. Rather than providing viable hearsay statements, the Government relied on statements made to its chief gent, without any information as to how the hearsay assertions were obtained and whether any absent declarant had any first-hand knowledge of the items asserted. Thus, the only evidence presented to the Court was statements that unknown persons said "Mr. Perez was the leader" with no additional information as to how this "information" was obtained. Such evidence is not sufficiently reliable to support a four level enhancement under the guidelines.

II.    The trial judge found that Roberto Perez was responsible for 9900 documents based upon an extrapolation of hearsay evidence that 99 Fargo printer ribbons had been purchased by members of the conspiracy (125 prints per ribbon with a 20% misprint rate). As a result of that calculation the trial judge increased the base offense level of 9 for the number of documents, § 2L2. l, Federal Sentencing Guidelines, by 6 levels. That calculation failed to account for the unreliable method of determining the numbers of documents and attributing all 9900 documents to Roberto Morales when he shared responsibility equally with two others in the organization and that the judge erred in increasing his Guideline levels.

11

ARGUMENTS

I.    The District Court Erred in Crediting Unreliable Hearsay Which Was the Sole
      Evidentiary Basis for a Finding the Appellant Held a Managerial Role in the
      Underlying Conspiracy

      A.    Standard of Review

      This Court reviews the trial court's assessment of sentencing enhancements for

clear error. *United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002) and *United

States v. Cameron*, 573 F.3d 179, 184 (4th Cir 2009).

      B.    Argument

      At the commencement of the evidentiary hearing, defense counsel objected to

the use of hearsay plea agreements as proof under these circumstances.  JA 66.  The

Court overruled the objection: "[The Court]:  Okay, I understand your objections, and

they will be overruled…I think the day's long past where there can be any meaningful

objection to hearsay at sentencing…"  JA At 68. Indeed, the Court pointed out that

the use of hearsay in some circumstances can shorten the sentencing proceeding:

"[The Court]: [T]here are sentencings where there has been an agreement as to a basic

statement of facts enough to prove the guilt of the Appellant on the charge, and then

there is essentially an evidentiary proceeding, especially when you're talking, for

12

example about amounts of narcotics or, in this case, the number of documents,[3] and truly, to prevent miniature trials that hearsay can be used." JA 68. The Court, however, acknowledged the limited effectiveness of hearsay alone as proof:

> [The Court]: Now, I am mindful that it is hearsay, … but I also expect that Ms. Fine, an excellent lawyer who is here, understands that, in addition to the hearsay, I would firmly expect her to – we'll hear from, among others, I'm sure, Special Agent Lopez, … <u>So, I don't think the Government, unless I'm surprised, is going to be relying entirely on hearsay.</u>"

JA 69. (Emphasis added.) Contrary to the Court's expectations, on the specific issue of Mr. Altimarano's alleged leadership role, the Government presented only hearsay statements of unnamed witnesses.

The Government sought what was essentially a double increase for the Appellant. By alleging that he was a leader, it first sought an additional 4 level upward departure under USSG Sec. 3B1.1(a). More importantly, by claiming that Mr. Altimarano Perez was a leader, the Government then sought to hold him responsible for the full breath of the organization for the two years prior to its termination under USSG Sec. 2B1.1(a). Comment 3(A)(iv) to that section provides that "For the purposes of this guideline, 'reasonably foreseeable pecuniary harm'

---

[3] Appellant had no personal knowledge of the number of documents sold by the conspiracy. He did not dispute the number of documents claimed by the Government.

13

means pecuniary harm that the Appellant knew, or, under the circumstances, reasonably should have known, was a potential result of the offense.".  Thus, the Government argued that if Mr. Altimarano Perez was a leader, he was aware of the entire breadth of the conspiracy and therefore it was reasonably foreseeable that he was aware of the thousands of documents being sold and the millions of dollars collected.

The issue before the trial Court therefore boiled down to an examination of USSG Sec. 3B1.1(a) and whether the Government's presentation at the evidentiary sentencing hearing sufficed to support a finding that this Appellant was a leader of this conspiracy.  USSG Sec. 3B1.1(a), entitled "Aggravating Role," provides:

Based on the Appellant's role in the offense, increase the offense level as follows: (a) If the Appellant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

Comment 4 to this section provides factors for the Court to consider in evaluating whether the government has proven this Appellant was a leader:[4]

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity and

---

[4]  Appellant agrees that the conspiracy involved five or more persons.

14

the degree of control and authority exercised over others.

The Appellant submits that, except for hearsay statements that simply alleged that he "was a leader", without any proof of the basis of knowledge for such assertions, the Government failed to meet the requirements of this section to justify and support the Court's finding that an enhancement under this section was warranted.

The Appellant agrees that the Government has proven by first-hand and physical evidence that Mr. Altimarano Perez was a knowing member of the conspiracy, although the dates of his involvement are far from clear. At the time of his arrest in August, 2011, he had an empty printer box in his car that matched the printer found at the document mill. JA 132-133. He sold documents on at least two occasions to a co-conspirator working for the Government. JA 106-121. Appellant hung out at times at or near 200 Broadway where the conspiracy sold the documents. JA 84-90. He, along with others in the conspiracy, had cards printed that contained his phone number. JA 92-93. On one occasion, he was recorded on a phone call telling a Government cooperator to whom the cooperator should provide payment for documents that Appellant sold. JA 119. These facts unquestionably establish that Mr. Altimarano Perez was a knowing contributor in this conspiracy. And he admitted as much in his guilty plea.

15

Beyond these facts, however, the entire remaining presentation by Government comes from out-of-court hearsay statements as told to Agent Daniel Lopez. The Court and defense were not provided with the names of these persons. The defense was unable to research the criminal records of these witnesses, examine prior statement they have made and assess the consistency of their statements with other evidence in this case. Although the Government may have valid reasons for not disclosing the names, the absence of such information put the defense at a significant disadvantage.

Because these persons did not testify, the Court had no information regarding the source of these persons' information, whether they have any first-hand knowledge or were simply repeating rumors they may have heard. The defense was unable to identify any potential biases for these persons and any reasons for them to shade their statements in return for any benefits from the Government.[5]

Most importantly, the unnamed cooperators were not subject to cross-examination. The Appellant was denied the most basic right to confront and question any of these witnesses. Indeed, on two separate occasions, in response to defense

---

[5]  Many of the persons identified by Agent Lopez were suspected to be illegal aliens. Had these persons appeared under oath in court, the Appellant would have been able to explore how cooperative these aliens were in exchange for not having their immigration status investigated.

16

objections, the Court pointed out the value of the opportunity to cross-examine the Government's witnesses. JA 77, 145. As a result, the Appellant submits that the quality and reliability of this type of proof is inadequate to support an enhanced sentence in this case.

The essence of the Government's presentation consists of a series statements from unnamed persons who told Agent Lopez that this Appellant was a leader. For example, in referring to the entire group of five cooperators, the Government inquired as follows:

> Q.    And what did they tell you with regard to who was responsible or who was in charge of the Broadway organization?
> A.    They clearly identified as Elmer [Appellant] was the individual in charge of the organization.

JA 81. Similarly, when asked about another anonymous source, CS2, the Government asked:

> Q.    And were they able to identify for you who they had seen on Broadway trafficking documents?
> A.    They identified the runners that we indicted. They also identified Roberto Morales Perez, and they identified Ivan Altimarano Perez as the leader.

JA at 83. No information was provided as to how or why CS2 made this assertion.

Similarly, with regard to a third unknown person, CS3, who is not a member of this conspiracy, the Government asked:

17

Q.    Okay and did he indicate who was in charge of the Broadway organization?...

A.    He identified Ivan Altimarano Perez.

JA 84-85.  Again, no evidence of any first-hand knowledge or reliable source for this information by this unknown declarant.  Such is the extent of the Government's presentation from witnesses in an attempt to prove that Mr. Altimarano Perez was a leader of this conspiracy.  Appellant submits that such statements, without any basis of knowledge, specific facts, confirmation of the credibility of these cooperators  or disclosure of their potential biases do not meet the requirements of USSG Sec. 3B1.1(a) and the factors outlined in its Commentary.  If proof at sentencing is to have any significance, then simply saying "he was a leader", without more, ought not be enough to make it so.

This Court has confirmed that the seven factors listed in the Comments to the Guidelines are in fact the appropriate standards by which to measure whether the Government has established an enhancement under USSG Sec. 3B1.1(a).  *Sayles*, at 224 and *Cameron*, at 184.  An examination of each of these factors, and the lack of proof attendant to each, shows that the Government failed to meet its burden.

a.    <u>The exercise of decision making authority</u>

In one instance, Mr. Altimarano Perez told Mr. Merlin Gonzalez that he should

18

give money to Daniel Cruz-Martinez to pay for documents delivered by this Appellant. Other than that single phone call, the Government has presented no evidence that Mr. Altimarano Perez made any decisions in this conspiracy. [6]

Even if the Court credited the hearsay statements of Tenant, Mr. Altimarano Perez selected the location for the manufacturing mill for the last three months of the conspiracy. JA 167, 168. (Agent Lopez stated that the conspiracy moved into the South Parrish Street address in April or May of 2011 and conspiracy was taken down in August, 2011. *Id*. Such an action makes Appellant a conspirator, it does not establish that he had authority to direct the overall conspiracy for two years.

b.     The nature of participation in the commission of the offense

There is no dispute that Appellant participated in the commission of the offense. He acknowledges that he sold documents for the Broadway organization. There is no evidence that he manufactured documents (he did not plead to manufacturing) or that he had any personal knowledge of the extent of the conspiracy.

---

[6]     The sole exception is an allegation made by Agent Lopez on cross-examination in which he stated that this Appellant "actually delegated, according to "Cooperator", who would be allowed to be on the street certain days." JA 176. Again, in addition to the obvious grounds for deceit by Mr. "Cooperator" (he was caught red-handed and understood that absent his cooperation he would be jailed and deported, JA 176-177), no factual basis or personal knowledge was presented to give credibility to this statement. Interestingly, despite having several recorded phone calls with this Appellant, Mr. "Cooperator" never addressed Mr. Altimarano Perez' alleged leadership role while anyone else was listening.

19

Although he had the printer box for one of the organization's printers in this car, the Government established that someone else (Mr. Aldo) purchased the materials for the conspiracy. Aldo, as the purchasing agent, would have first-hand knowledge of the thousands of documents sold by this group. There is no evidence that Mr. Altimarano Perez had any similar knowledge.

The Appellant did have business cards with his phone number on them that he gave to potential customers. JA 127, 130. Others in the conspiracy had cards with their numbers on them as well. JA 172-173. The conspiracy's goal was to sell false documents. Mr. Altimarano Perez sold false documents. Seeking customers certainly makes him a participant; it does not make him a leader. There is no evidence that he was producing business cards for others or directing other to produce such cards.

c.    <u>The recruitment of accomplices</u>

No evidence was presented to suggest that Mr. Altimarano Perez recruited anyone in this conspiracy.

d.    <u>The claimed right to a larger share of the fruits of the crime</u>

The Government presented evidence that the leaders of the organization received a larger share of the profits from the documents sales. No evidence was presented that Appellant ever received any large share of the profits. Other than the bare allegations that he was a "leader" there is no indication that he received a larger

20

share of the fruits of this crime.  Indeed, when his house was searched, the agents

found a total of $307.00.  JA  195.  Nothing was seized from this Appellant that

suggests he made large expensive purchases with conspiracy profits.  The Appellant

suggests that $307.00 does not constitute a 'larger share" of the $1,600,000.00 that

was taken in by this conspiracy.

      e.    <u>The degree of participation in the planning or organization of the
offense</u>

The sole suggestion of any planning by Mr. Altimarano Perez comes from the

hearsay allegation that this Appellant arranged for the document mill for the final

three months of the conspiracy.  JA 151.  There is a suggestion that Appellant paid

the rent as well, but the actual testimony does not support this allegation.

> Q.    And it was Roberto Morales who brought the money for the rent
> every month?
> A.    He – what happens, he would get – he got paid several times by Ivan,
> but he would leave the money on the table – on the kitchen table. …

JA 167.  Thus, the actual facts establish that the out-of-court declarant, identified only

as "Tenant", did not know who left the money on the table while Tenant was out

during the day.  See JA 168.  Appellant accepted that he may be held responsible for

arranging the location of the mill.  Beyond that fact, the Appellant submits that there

is no evidence of him participating the procedures at the South Parrish location.

f.    The nature and scope of the illegal activity

According to the Government, this conspiracy lasted for more than three years, involved thousands of documents and earned over $1.6 million.  The Appellant submits that if in fact he was a leader of this organization, there would be extensive actual, factual information to provide the Court to substantiate this allegation.  Rather, the Government, in its best light, has bits and pieces of undated facts that prove Mr. Altimarano Perez' involvement but do not establish him as a leader.  No evidence was presented that this Appellant ever went to the document mill, that he directed others on a regular basis, that he decided where or when to sell the documents or that he controlled this group.  Given the length and breadth of this conspiracy, evidence of this Appellant as a leader, if it existed, would be much more comprehensive than mere conclusory hearsay statements.

g.    The degree of control and authority exercised over others

The absence of evidence supporting this factor has been addressed above.

The real question for the trial court was not the bald statements themselves but the value and quality of the hearsay evidence presented by the Government.  In order to enhance a sentence from a range of 3 to 4 years to a range of 15 to 17 years, the Appellant submits that, consistent with Fourth Circuit law, such

proof must be substantial, reliable and trustworthy. This Court has "repeatedly allowed a sentencing court to consider "any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy." *United States v. Powell*, 650 F.3d 388, 392 (4th Cir. 2011), *quoting United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010). Appellant does not challenge the use of hearsay, even the use of hearsay alone at sentencings. Appellant challenges in this case that the hearsay in fact had zero "sufficient indicia of reliability to support its accuracy."

Without any cross-examination of the actual declarants, the Court was also not afforded the opportunity to assess the credibility of the witnesses. More importantly, the Court had no information about the source of knowledge for these out-of-court witnesses. The Court did not know whether the out-of-court assertions were based on conversations with the Appellants, assumptions made by the witnesses or just the repetition of rumors. On the third point, Agent Lopez acknowledged the danger to relying on unsubstantiated statements. When asked whether unnamed "Witness 5" was involved in the sale of fraudulent documents, Agent Lopez wisely stated:

A.    It's my understanding, but I do not know.  <u>It's like you hear these rumors, but you don't have any concrete proof</u>.

JA 171.  (Emphasis added).  The Government left the trial Court in the same unclear

position. The hearsay allegations had no indicia of credibility or any indication of the source of the assertions. Under these circumstances, such statement could not suffice to provide a basis to find that Appellant was due a four level enhancement for being a leader of this conspiracy.

As a result, District Court's holding that the Government had established that Appellant was a leader of this conspiracy was erroneous and this case should be remanded for resentencing.

II.     The Trial Court Erred in Sentencing Roberto Morales

    A.     Standard of Review

This Court reviews the factual findings of the district court for clear error and all legal conclusions *de novo*. *United States v. Medina-Campo*, 714 F.3d 232, 234 (4th Cir. 2013).

    B.     Argument

The Court determined that 99 Fargo color ribbons were purchased along with 13,500 pieces of white plastic card stock. With a finding that approximately 20% of the printed cards were misprints the district judge determined that altogether the ribbons were capable of creating 9900 documents. JA 215.

The district court relied upon the statements made to the testifying agent by an unidentified individual who stated that all the Fargo ribbons were delivered to

Aldo and there were approximately 99. JA 143-144. Aldo has not been arrested nor is his real name known. JA 179-180. Aldo was also connected to the address where the printing of documents occurred. JA 152. This Court has "repeatedly allowed a sentencing court to consider "any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy." *United States v. Powell*, *supra.* There was no "indicia of reliability" in the hearsay statements regarding deliveries to Aldo.

Based upon a finding that Roberto Perez Perez were responsible for 9900 documents the trial court found that a six level upward departure was appropriate for each of them. JA 219, JA 221. Thus the trial court determined that under § 2L2.l, Federal Sentencing Guidelines[7], the base level of nine would be increased by six levels for the number of documents.

While it is true that this Circuit has stated in *United States v. Harrison,* 272 F.3d 220, 223 (4th Cir. 2001) that "a defendant who undertakes a joint criminal activity is accountable, for sentencing purposes, for the reasonably foreseeable conduct of the others involved in furtherance of the jointly undertaken criminal

---

[7]Section 2L2.1 contains enhancements for document-trafficking offenses based on the number of documents involved. The maximum enhancement is 9, for offenses involving 100 or more documents. Application Note 5 states: "If the offenses involved substantially more than 100 documents, an upward departure may be warranted."

25

activity", it is not obvious from the facts before the trial court that Roberto Perez knew of the total scope of the conspiracy. He worked in the conspiracy one week out of every three weeks. Therefore he had personal knowledge and responsibility for approximately 3300 documents. A review of cases from other jurisdictions show that for that range of documents trial courts have increased the base level in the sentencing guidelines by two or three levels, not six as the trial court did in this case. *United States v. Velez,* 185 F.3d 1048 (9th Cir. 1999), rev'd on other grounds; *United States v. Contreras,* 593 F3d 1135 (9th Cir. ) (affirming two-level upward departure because at least 2,700 immigration files were involved); *United States v. Vargas*, 73 Fed. Appx. 746, 747 (5th Cir. 2003) (affirming two-level increase in another case involving 2,700 documents); *United States v. Perez*, 90 Fed. Appx. 168, 169-71 (7th Cir. 2004) (affirming departure equivalent to three offense levels for leader of enterprise that manufactured and sold at least 500 sets of documents).

As the trial court's decision to hold Roberto Perez responsible for 9900 documents was clearly erroneous, and the guideline range was calculated on that basis, especially noting that the trial judge increased the guideline range by six levels where sister courts have found consistently either a two or three level departure for the range of documents Roberto Perez was responsible for, this matter should be remanded for a new sentencing proceeding.

26

CONCLUSION

For the reasons set forth above, Defendants, Ivan Perez and Roberto Perez , respectfully request that this Honorable Court  reverse the judgment of the court below.

Respectfully submitted,

Richard Bardos                                          Thomas J. Saunders
Court Appointed Counsel                     Court Appointed Counsel
Schulman Hershfelder Gilden                                   Suite 201
Ste 1800 401 E Pratt St.                         3600 Clipper Mill Road
Baltimore, MD 21202                         Baltimore, Maryland 21211
410-332-0850                                                 410-662-5586

27

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH LIMITATIONS

This Brief has been prepared using WordPerfect X5, 14 pt. Times Roman

EXCLUSIVE of the Table of Contents; Table of Citations; Statement with

respect to oral argument; and the Certificate of Service, the Brief contains 6614 words

which does not exceed the limitation of 14,000 words.

I understand that a material misrepresentation can result in the Court's striking

the brief and imposing sanctions.  If the Court so directs, I will provide an electronic

version of the Brief and/or a copy of the word or line print-out.

CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2013, I electronically filed, with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit, the Brief of Appellants using the Court's CM/ECF system which will send notification of such filing to the following counsel:

Tamera L. Fine AUSA,
Ayn Ducao, AUSA,
Christopher Romano, AUSA,
Office of the United States Attorney,
36 S. Charles St., 4th Floor,
Baltimore, MD 21201

AND the Brief will be translated by a court-certified interpreter and mailed to Ivan Perez and Roberto Perez care of the Bureau of Prisons once the translation is completed.

Thomas J. Saunders

29